# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 12, 2000 Session

## STATE OF TENNESSEE v. CHARLIE M. GARDNER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-D-2814     Cheryl Blackburn, Judge**

---

**No. M1999-02214-CCA-R3-CD - Filed March 30, 2001**

---

The Defendant, Charlie M. Gardner, was found guilty by a Davidson County jury of one count of first degree premeditated murder and two counts of reckless aggravated assault. The jury sentenced the Defendant to life without the possibility of parole for the first degree murder conviction, and the trial court sentenced the Defendant to four years for each reckless aggravated assault conviction, all sentences to be served consecutively. In this appeal, the Defendant challenges (1) the admissibility of hearsay statements as falling within the excited utterance exception, (2) the sufficiency of the evidence as to all three convictions and (3) the fatal variance between the allegations in count two of the indictment and the proof offered at trial. Based upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

C. Edward Fowlkes and Thomas L. Whiteside, Nashville, Tennessee, for the appellant, Charlie M. Gardner.

Paul G. Summers, Attorney General and Reporter; Russell S. Baldwin, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Roger D. Moore, Assistant District Attorney General; and Sharon L. Brox, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant, Charlie M. Gardner, was indicted by the Davidson County Grand Jury for one count of first degree premeditated murder and two counts of aggravated assault. The first trial of the Defendant resulted in a hung jury. After a second, four-day trial, Defendant was found guilty of first degree premeditated murder and two counts of reckless aggravated assault. The jury sentenced Defendant to life without the possibility of parole for the first degree murder conviction,

and the trial court sentenced Defendant to four years for each reckless aggravated assault conviction, with the four-year sentences to be served consecutively as to each other and as to the life sentence. In this appeal as of right, Defendant presents three issues for our review:

I.     Whether statements made by a witness to police shortly after the shooting were admissible as falling within the excited utterance exception to evidentiary rules prohibiting hearsay;

II.    Whether the allegations in count two of the indictment, charging the defendant with the aggravated assault of Said Awad, fatally varied from the State's proof; and

III.   Whether the evidence was sufficient for a rational trier of fact to find the defendant guilty of each count beyond a reasonable doubt.

After a review of the entire record, we conclude that the trial court did not abuse its discretion in admitting the testimony of Officer Mackovis Peeples concerning statements made to him by Chaka Moore after the shooting under the excited utterance exception to the hearsay rule. We further conclude that no fatal variance between the State's proof at trial and the allegations in count two of the indictment occurred. Finally, the evidence was sufficient for a rational trier of fact to find Defendant guilty of each count. The judgment of the trial court is therefore affirmed.

## **FACTS**

The events of this case took place in the early morning hours of Saturday, October 18, 1997, at a popular night spot called Club Yesterdays located on the Clarksville Highway in Davidson County. The club operated from 1995 until December of 1998. For approximately a year prior to the crime date, the club had been leasing its facility to a private group of individuals who sponsored an event each month called Third Friday. This private group of individuals used radio advertisements, flyers, and mailers to publicize the Third Friday event where people, primarily a young business crowd, came in dressy attire for dancing to recorded music, food, and drink. Third Friday was apparently a highly successful and popular event, drawing close to 1,000 patrons at times, a number in excess of the 530 capacity number for Club Yesterdays.

During its years of operation, security at Club Yesterdays was managed by Don Brown and included unarmed guards hired by him who wore T-shirt uniforms, sometimes bright yellow, sometimes black, with lettering to indicate that they were part of the security force. These guards worked the entrance/exit of the club and the inside area. Because of the increased number of patrons for Third Friday, extra security personnel was hired, including armed guards who were posted outside in the parking area.

Among the security guards hired by Don Brown to work the Third Friday event at Club Yesterdays was the victim, Demetrius Laquan Wright, a twenty-three-year-old junior at Austin Peay State University majoring in criminal justice. Wright was a full-time student who had grown up in a military family and had experience as a part-time security guard. Nathan Bell, a friend of Wright's and his roommate, recommended Wright to Brown. Bell also worked part-time for Brown.

The Defendant and Wright knew each other. On the immediately previous Third Friday event, held at Club Yesterdays in September, the Defendant had to be thrown out of the club. Apparently he was engaged in an argument with a female patron and was about to inappropriately touch her. Wright was one of the first security guards to respond to the situation. Brian Coleman, a security guard who had worked at the club for nine months and knew the Defendant, also responded. The Defendant was separated from the female and told to leave. Instead, he got into a physical struggle with Wright. The Defendant bit Wright's ear, and Wright hit the Defendant in the face. Robert Utley, general manager of the club who also knew the Defendant as a regular patron, arrived on the scene, and he and Coleman restrained the Defendant. The Defendant was forcefully escorted out the back door of the club. Don Brown arrived in time to witness the removal of the Defendant from the club. The Defendant did not go quietly, but loudly threatened Wright, screaming that he was "going to kill him." Once outside, the Defendant continued his angry tirade, threatening to "go get a gun" and claiming that he had not done anything and did not appreciate being hit in the mouth. The Defendant was apparently not seen again at Club Yesterdays until the next Third Friday, held on October 17, 1997.

Don Brown and Nathan Bell were working in the parking lot on the Third Friday event held October 17, 1997. Brian Coleman was working inside the club. The victim was working at the front entrance where identifications were checked and patrons were searched for weapons and bottles. A crowd of between 800 and 1,000 people attended this Third Friday event. The crowd inside the club was described as being packed shoulder to shoulder. At approximately 1:15 a.m. on October 18, a large crowd was still lined up to enter the club when Brown spotted the Defendant and a group of other males getting out of a car and walking toward the club. Brown decided to move Wright off the front door and station him inside the club as a precautionary step to avoid any replay of the altercation that had occurred in September between Wright and the Defendant. Bell was told to go to the front entrance and replace Wright. Brown watched the Defendant for some ten or fifteen minutes until a fight in the parking lot distracted him, so he did not see the Defendant approach the club entrance. Bell, now working the front door, was not used to handling such large crowds at the entrance and admitted that he did not hand frisk every single individual who came through. Bell did not know the Defendant and was not able to positively identify him as having entered the club.

Coleman, who did know the Defendant, was moving to a new assignment at the front door when he saw the Defendant come in the club. Coleman knew the club policy was not to allow a patron who had been in a fight at the club to be readmitted, so he went to find Utley, the general manager. Before he could locate Utley, he heard shots being fired.

Utley, who was inside the club at the time, had also seen the Defendant enter the club and, shortly thereafter, heard gunshots. He turned back toward the front door and saw the Defendant running out of the club. Utley chased the Defendant into the parking lot. Bell also heard the shots and stepped to the side to avoid the first wave of panicked patrons who ran out the front. When Bell saw Utley running out into the parking lot after someone, he followed to assist him, but the chase ended when the Defendant vanished.

Back inside the club, the victim, Demetrius Laquan Wright, lay on the floor between the bar and one of the two raised dance floors. He had been shot twice in the back. Wright was transported to Vanderbilt University Medical Center where he died, shortly after arriving in the emergency room. Two other victims, bystanders in the crowd at the club, received gunshot wounds to the legs. These victims were identified as Said Awad and Omari Neal in counts two and three, respectively, of the indictment.

## ANALYSIS

### I. Admissibility of Hearsay Testimony As Excited Utterance

The Defendant argues first that the trial court erred in allowing Officer Peeples to testify concerning statements made to him by Chaka Moore shortly after the shooting. Specifically, the Defendant alleges that the trial court erred in admitting testimony, over defense objection, by Officer Peeples in which Peeples stated that Moore told him she saw the shooting at the club and named the Defendant. Because identity was the critical issue in the case against the Defendant, he argues that this hearsay testimony, allowed in as an excited utterance exception to the hearsay rule, was fatally prejudicial to him.

According to Chaka Moore's testimony, she was at Club Yesterdays at the time of the shooting. Moore testified that she was a regular patron of the club and had known the Defendant for two years. She was at the club with friends and was standing near the bar at the time of the shooting. Moore testified that when she heard the sound of shots being fired, she dropped to the floor. People were running to get away. When she looked around, she saw the body of the victim on the floor. She recognized him as an employee of the club. She looked up and saw the Defendant, whom she knew as "Chewie," standing over the victim, approximately four feet from his body. Moore could not recall what the Defendant was wearing. After she saw the Defendant turn and run from the club, she called 9-1-1 on a cellular phone. Moore did not wait for the police but left the club with her friends and went immediately to a nearby Waffle House on Trinity Lane.

Mackovis Peeples, a master patrol officer with the Nashville Metro Police Department, was working an extra job in uniform at the Waffle House when Moore and her friends arrived. It was unclear from testimony of Peeples and Moore which one approached the other first. Moore stated that she was not looking for an officer. According to Moore's testimony, she told Peeples "what happened at the club." She testified on cross-examination that Officer Peeples did not ask for her name or telephone number and, as far as she knew, had no way of contacting her.

Officer Peeples testified that he recognized Moore from having seen her in court on a prior occasion and remembered her unusual first name, Chaka. Officer Peeples further testified to the following on direct examination:

Q. After you spoke with the woman you knew to be Chaka, what did you do with that information?

A. Well, she came in. She was a bit terrified, scared, you know, like a little bit paranoid, you know, nervous, extremely scared I guess you would say, and she told me she had just come - -

MR. FOWLKES: Object, Your Honor, to what she said. She has testified.

A. (WITNESS) She advised me - -

MR. FOWLKES: Same objection, Your Honor.

GENERAL BROX: Judge, I think certainly he can testify as to the excited utterance, and let me talk with him a little bit more about that.

THE COURT: All right.

Q. (GENERAL BROX) Officer, describe Chaka's demeanor.

A. (WITNESS) Very scared and afraid and looked to be a tad paranoid.

Q. Okay, and did you ask her any questions?

A. Yes, I did.

Q. Okay. What did you ask her?

A. Well, I, you know, I could tell she was afraid of something, you know, and I thought somebody maybe was bothering her or something, but she had just come from Club Yesterdays where a shooting had just occurred.

Q. And as she told you this story, what was her demeanor?

A. Scared and nervous, afraid, very much afraid.

Q. And how close in time to her telling you about this did the shooting occur?

A. Not more than 10 or 15 minutes ago.

MR. FOWLKES: Objection, Your Honor, there is no way he would know that, plus she has been here and testified.

THE COURT: Overruled. I will allow it, excited utterance. Go ahead, General Brox.

Q. (GENERAL BROX) Tell me, Officer Peeples, what information did she tell you?

A. (WITNESS) She observed the shooting that occurred inside of Club Yesterdays. The suspect was standing close to her or not far from her, and I asked her did she know his name, and she gave me the name of Charlie Gardner, and at that time, I went to my radio to a county-wide channel and tried to raise a homicide detective to ask him if a shooting had occurred, and no one had gotten back with me because I guess they were all in route to that scene at the time, but I left a name with the dispatcher, and had them notify a homicide detective of what I had found out as far as the suspect information.

Here, there is no argument that the statements of Moore as offered by Officer Peeples were hearsay. They were out-of-court statements "offered in evidence to prove the truth of the matter asserted," Tenn. R. Evid. 801(c), and were, therefore, inadmissible except as otherwise provided by law. See id. 802. A statement, otherwise hearsay in nature, is, nevertheless, admissible as an excited utterance if it relates "to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Id. 803(2). The first two requirements are met here: there was a startling event and the statements related to that event. The issue is whether the evidence in this record shows that the declarant, Moore, was making the statements while under the stress of excitement caused by the event. Among the relevant considerations in making this determination are the following: (1) the time interval between the making of the statements and the startling event; (2) the nature and seriousness of the event; (3) the appearance, behavior, outlook, and circumstances of the declarant, including characteristics such as age, physical condition, and mental condition; and (4) the contents of the statements, which may indicate the presence or absence of stress. See State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997). These considerations support the rationale behind the excited utterance exception, which is that such statements are admissible as reliable because they are made where time for reflection and possible fabrication is lacking and memory of the event is still fresh. See id. at 819-20 (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 803(2).1, at 532 (3d ed. 1995)).

The record shows that Moore went immediately from the scene of the shooting to the Waffle House. Moore had been physically close to a deadly shooting in a crowded night club and reacted initially to the sound of gunfire by throwing herself to the floor as a means of protection while other panicked patrons ran from the scene. Testimony indicated that she appeared shaken when she arrived at the Waffle House, so much so that she either drew the attention of an experienced police officer or else she sought out an officer to relay what had occurred. In either case, Officer Peeples described her as appearing scared and agitated. Her statements related the stress of seeing the Defendant, a man she knew, standing close to the body of the victim. This is sufficient evidence to support the trial court's determination that Moore's statements to Officer Peeples were admissible as excited utterances.

The Defendant further argues that the word "observed" in Officer Peeples' testimony implies that Moore saw the actual shooting and identified the Defendant to Officer Peeples as the shooter. The State counters that Moore had already testified that she only "heard" shots and subsequently saw the Defendant standing over the body of the victim. We agree with the State that there is no difference of any consequence between the testimony of Moore concerning the shooting and the testimony of Officer Peeples concerning statements made by Moore to him about the shooting. Thus, Defendant is not entitled to relief on this issue.

## II. Variance

The Defendant argues next that the proof offered by the State and the allegations of the indictment in count two varied fatally, and the Defendant is entitled to an acquittal as to count two. The allegations in count two are as follows:

> THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:
> CHARLIE M. GARDNER
> on the 18th day of October, 1997, in Davidson County, Tennessee and before the finding of this indictment, intentionally or knowingly did cause bodily injury to Said Awad by the use or display of a deadly weapon, to wit: a handgun, in violation of Tennessee Code Annotated § 39-13-102, and against the peace and dignity of the State of Tennessee.

At the close of proof in this case, the State read the following statement from a document, which was not included in the record on appeal:

> The State elects that Count 2 of the indictment refers to the individual who was observed in the area of the pool tables. The person was described as being unable to speak English and had received an injury to his leg, and I will file this with the Clerk.

-7-

The Defendant does not argue that no one in the area of the pool tables received a gunshot wound to the leg. Rather, the Defendant argues that the allegations in count two specifically named Said Awad as the victim, and the State's proof fatally varied from the allegations by failing to identify such an individual as the victim.

The Defendant is correct in noting, generally, that a variance occurs when the proof offered at trial does not conform to the allegations made in the indictment. In such a case, the Defendant is entitled to have the conviction reversed because an accused cannot be charged with one offense and convicted of a completely different offense. See State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). The Defendant was charged with aggravated assault of Said Awad. Evidence at trial showed that an individual was seen by three witnesses sitting in the area of the pool tables after the shooting. This individual had received a bullet wound to the leg. He was unable to communicate effectively in English. His name, relayed by police to one witness at the club, was "strange." Evidence showed further that this individual sought treatment at Baptist Hospital and was interviewed by Sergeant Hullet who testified that the individual was Said Awad, a Somalian refugee. Awad had sustained a through-and-through bullet wound to the leg. Based on this evidence, we conclude that no variance occurred.

Even if we were to find a variance in this case, it would not be material. While common law tradition held that strict conformity was required between proof and allegations, even in "minor and immaterial respects," State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984), our supreme court has adopted a less restrictive approach, known as the Berger standard, for determining when a variance between allegations in an indictment and evidence presented at trial is material and constitutes reversible error. The United States Supreme Court, in Berger v. United States, 295 U.S. 78, 82, 55 S. Ct. 629, 629, 79 L. Ed. 1314 (1935), concluded that a variance is not fatal if the defendant is sufficiently informed of the charges against him so that he can adequately prepare for trial and so that he is protected against any subsequent prosecution for the same offense. See id. at 79-82, 55 S. Ct. at 630. In Moss, our supreme court announced the following test:

> Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

Id.

In accordance with this standard, we must determine first whether count two in the indictment sufficiently informed the Defendant of the charges against him so that he could prepare a defense and not be surprised at trial. Here, the indictment informed the Defendant that he was

charged with intentionally or knowingly causing bodily injury to Said Awad on October 18, 1997, in Davidson County by the use of a handgun in violation of Tennessee Code Annotated Section 39-13-102. The indictment specifically described the person alleged to have been injured as, "Said Awad." There is no indication in the record that the Defendant was denied access to appropriate pretrial discovery relevant to the person Said Awad or that he was misled or surprised at trial or prevented from adequately preparing a defense against this charge.

The Defendant additionally relies on State v. Cox, 644 S.W.2d 692 (Tenn. Crim. App. 1982), for the proposition that the State has imposed on itself a special burden of strict proof when a named victim is substituted for the word "another" as set forth in the statute. However, a careful reading of the opinion in Cox indicates that the court was drawing a distinction between those early Tennessee cases that followed a strict variance rule and later cases following a growing judicial trend toward greater objectivity, a trend culminating in the holding in State v. Moss, 662 S.W.2d 590 (Tenn. 1984), which articulated the present standard applicable to variance issues, that is, the Berger standard.

Moreover, it is also clear that the indictment in count two is sufficiently specific to permit the Defendant to plead double jeopardy as a bar to any subsequent prosecution for the same offense. The Defendant is not limited to the wording in count two but may rely on the entire record in the event of further prosecution for the same offense. The indictment, together with the record, would prohibit another prosecution for the aggravated assault of Said Awad, whose identity was established by evidence as the individual who suffered a through-and-through gunshot wound to the leg on October 18, 1997, at Club Yesterdays. Such a determination is consistent with State v. Mayes, 854 S.W.2d 638, 641-42 (Tenn. 1993), in which our supreme court held that a defendant was protected from reprosecution of the same offense where an indictment specified the purchaser of illegal drugs by name, but the proof at trial showed that another person made the actual purchase. The facts here are far less problematic than those in Mayes. The Defendant is not entitled to relief on this issue.

### III. Sufficiency of the Evidence

In his final issue, the Defendant challenges the sufficiency of the evidence in each of the three convictions in this case. We address first the appropriate standard of review and turn then to each conviction in order.

### A. Standard of Review

In a criminal trial in Tennessee, great weight is given to the result reached by the jury. A jury verdict accredits the State's witnesses and resolves all conflicts in favor of the State. See State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from the evidence. See id.; see also State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, a guilty verdict removes the presumption of innocence that the appellant enjoyed at trial and replaces on appeal that

presumption of innocence with a presumption of guilt. See State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The appellant has the burden of overcoming this presumption of guilt. See id.

Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. See Cabbage, 571 S.W.2d at 835. The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier of fact. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984).

### B. First Degree Premeditated Murder of Demetrius Laquan Wright

The Defendant contends that the evidence was insufficient to support his conviction for the first degree murder of Demetrius Laquan Wright. We conclude that the evidence was sufficient for a rational jury to find beyond a reasonable doubt that the Defendant killed Wright intentionally and with premeditation.

The evidence showed that one month prior to the murder, the Defendant and the victim had been in a physical struggle brought on by the Defendant's actions against a female patron at Club Yesterdays. The victim, acting within his role as security guard at the club, sought, with the assistance of other security personnel, to evict the Defendant from the club. The evidence was that the Defendant bit the ear of the victim, causing it to bleed, while the victim struck the Defendant in the face. Evidence showed that the Defendant returned to Club Yesterdays in the early morning hours of October 18, 1997, on the occasion of one of the most popular events at the club, Third Friday. Within minutes of his having entered the club, shots were fired.

Tanisha Stewart testified as an eyewitness to the shooting. Stewart testified that she had frequented Club Yesterdays and knew the victim. She had attended a fraternity banquet with Wright approximately two weeks prior to the shooting. On the evening of the shooting, she and a group of friends were at Club Yesterdays for the Third Friday event. Stewart was checked at the door by Wright and then went into the club, which she described as packed. Stewart did not consume alcohol. She and her friends moved around the club. At some point after midnight, Wright passed by her and then turned and stopped to speak with her. Wright was standing directly in front of Stewart, and they were holding hands as they spoke. Stewart testified to the following:

> A. I remember standing there talking to him and his left hand was holding my right hand and we were talking, and from behind, I was pushed, it was so packed, and I was pushed by this big guy, and I turned around and I said I'm standing here, and I remember Laquan turning around and asking the guy to watch where he was going, and he turned back around and started talking to me.

Q. When you say he turned around and started talking to you - -

A. Laquan turned back around and started talking to me, and I remember this big guy in an orange shirt and dark colored pants walk, I seen him walk behind him, and he turned around and drew the gun and shot him.

Q. When the individual - - was it the same individual who had bumped into you?

A. Yes.

Q. And the same individual that Mr. Wright had told to watch it?

A. Yes.

Q. Okay. When the shots were fired, I believe you told us you were standing facing Mr. Wright. As the shots were fired, what view did you have of the person who fired the shot?

A. I was standing there looking directly at him.

Ms. Stewart testified that she could see clearly because the lights were lit in the bar, and she and Wright were standing in the area between the bar and one of the raised dance floors. Stewart identified the weapon as a small handgun. She heard five or six shots fired, one right after the other. The Defendant was standing approximately ten feet away from Stewart when the shots were fired. She was able to positively identify him from a photographic lineup on October 27, 1997. Additionally, Stewart positively identified the Defendant in court as the man she looked in the face and saw holding a gun pointed directly at the victim's back. Stewart testified that she had never seen the Defendant before the shooting.

Stewart testified further that the victim fell to the floor shortly after the first shot and was shot again. A friend grabbed her and pulled her to safety across the flat dance floor and under the small pool tables.

Chaka Moore testified that she was in the same area of the bar where the victim was shot. She fell to the floor when she heard shots and, when she looked up, she saw the Defendant, a man she knew, standing over the victim.

Dr. John Gerber testified as an expert in forensic pathology. He conducted the autopsy on the victim's body and concluded that the victim died of multiple gunshot wounds to the back. One wound was to the left upper back and involved a laceration of the left lung, heart, and the sac around the heart called the pericardium. The second wound was in the lower back and involved the small

-11-

bowel, left kidney, and soft tissue.  Two bullets were collected from the victim's body and turned over to law enforcement officers.  Dr. Gerber testified that the manner of death was homicide.

George Bouton, an identification officer with the Metro Police Department, testified that he retrieved one spent bullet in the area where Wright was killed.  That bullet was entered as Exhibit 10.

Sergeant Calvin Hullet testified that he retrieved one bullet, entered as Exhibit 13,  from the Middle Tennessee Medical Center in Murfreesboro where it had been taken from the leg of Omari Neal, the victim in count three.  Sergeant Hullet also retrieved two bullets, entered as Exhibit 14, from the medical examiner's office in Nashville where they had been taken from the body of the murder victim.  Sergeant Hullet testified that he took all four bullets, (Exhibits 10, 13, and 14), to the Tennessee Bureau of Investigation ("TBI") Crime Laboratory for examination.

Special Agent Don Carman, a forensic scientist with the TBI Crime Laboratory, testified as an expert witness in forensic firearms identification, or ballistics.  Agent Carman testified that he received four fired lead bullets to determine if they were fired through the same barrel.  He testified that the bullets were all .38/.357 caliber, round nose lead bullets.  Agent Carman further testified that the only weapons he could identify that produce the particular types of lands and grooves found on the bullets he examined were revolvers, predominantly of Colt manufacture.  Of the four bullets he examined, Agent Carman was able to determine conclusively that three of the bullets, the bullet found on the floor of the club, (Exhibit 10), and the two bullets taken from the body of the murder victim, (Exhibit 14), came from the same gun.  The fourth bullet, (Exhibit 13), taken from victim Neal, was too mutilated to make a conclusive identification, although Agent Carmen determined that the fourth bullet had similar land and groove characteristics as the other three he examined.  No bullet was taken from the body of the victim in count two of the indictment, Said Awad.

A rational jury could conclude from the evidence in this case that the Defendant sought to get even with the victim, Demetrius Laquan Wright, for having hit him in an altercation at Club Yesterdays that resulted in the Defendant's being expelled from the club; that the Defendant returned to the club in the early hours of October 18, 1997, sought out the victim, who was distinctively dressed in a security guard's uniform shirt, and fired multiple shots into the crowded club; that the Defendant intentionally and with premeditation inflicted multiple gunshot wounds to Wright that caused his death; that the Defendant was positively identified as the person who fired the shots at Wright and as the person standing over the victim after the shooting.  Thus, the evidence was sufficient to support the Defendant's conviction for the first degree murder of Wright.

### B.  Reckless Aggravated Assault of Said Awad

The Defendant includes both convictions for reckless aggravated assault in his statement of Issue III, but argues only that the proof was insufficient to support the murder conviction.  Nevertheless, under Issue II, the Defendant argues at length that the proof was insufficient to convict him of the reckless aggravated assault of Said Awad because the State offered no proof that the

-12-

individual identified as Said Awad by Sergeant Hullet was the same individual observed and spoken to by the witnesses Don Brown, Brian Coleman, and Robert Utley. As fatal flaws in the State's proof, the Defendant points to the fact that Awad never testified; that there were no medical records showing Awad had ever received treatment at Baptist Hospital; and that there was no bullet retrieved from Awad's leg. Although we acknowledge that the State's evidence in count two lacked this proof, the test for sufficiency of the evidence is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. The trial court charged the jury as to reasonable doubt as follows:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

> A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case.

A person commits reckless aggravated assault who commits an assault causing bodily injury to another and uses or displays a deadly weapon. See Tenn. Code Ann. §§ 39-13-101(a)(1) – 102(a)(2)(B). The evidence showed that the Defendant used a deadly weapon. Two gunshots entered the back of the murder victim; one entered the leg of the aggravated assault victim in count three, Neal; and a spent bullet was found on the floor. Tests showed that the spent bullet found on the floor in the area of the murder and the two bullets taken from the murder victim's body came from the same handgun. Tests also showed that the bullet taken from Neal, although not conclusively from the same weapon, was not ruled out as having come from the same weapon. Sufficient evidence proved the use of a deadly weapon, in this case, a handgun.

Evidence showed that, after the shooting had ended and the Defendant had run from the club, club personnel determined that the gunshots had caused bodily injury to two individuals other than the murder victim, one of whom was located near the pool tables.

Don Brown, head of security at Club Yesterdays, testified that it took him about ten minutes to get inside the club after the shooting. He testified to the following on direct examination:

> A. Yes. I went in to assist - - well, I saw one guy had been shot in the leg, and there was someone who appeared to have a flesh wound so I proceeded to go and find out if anybody was hurt real bad. And when I got to the bar, I saw Demetrius laying on the floor. And it was

two or three people around him trying to make sure that he was being stable and calm.

Q. Now, let me step aside here for just a second. You said you saw someone that appeared to have a flesh wound?

A. Right.

Q. Where was that wound on this person?

A. He was near the pool table. It was his leg, he was sitting in a chair by the pool table.

. . . .

Q. Did you speak to that individual, find out his name?

A. He was hysterical. So I didn't get nothing out of him so I just kept going, trying to look around to see how bad it was, who was hurt the worst.

Brown testified further on cross-examination that the wounded individual sitting in a chair by the pool tables was a foreigner and that he, Brown, "couldn't understand a word he was saying."

Brian Coleman, a security guard, testified that after the shooting he was inside the club trying to see whether anyone had been injured. He saw Wright on the floor and saw "another gentleman back by the pool tables, and one other person had hopped outside." Coleman had aided the victim who hopped outside and testified that this person had a gunshot wound to the leg. Coleman then returned to the club where he saw the individual by the pool table who appeared to have also suffered a bullet wound to the leg.

Robert Utley, club general manager, testified to the following on direct examination:

Q. And did you see any other individuals there who appeared to have been injured that night?

A. At that time, no. After the medical personnel had attended to Mr. Wright, I was walking up toward the top bar to lock the cash registers, and someone had said there was a gentleman and a young lady. The young lady was behind the bar in the supply room since she had been injured, and there was a young gentleman on a bench that said he had been injured.

-14-

Q. Okay. Now as far as the young gentleman on the bench, could you see by looking at him or did you look at him to see if it appeared that he had been injured?

A. Yes. I went up there and asked him was he all right, and he said he had been shot in the leg. He didn't expect to die. He was just in pain, and then the young lady, I went to see her, and she said she had strained her ankle.

. . . .

Q. Just one thing, the person who was sitting back on the bench injured, with the leg injury, did you happen to get that gentleman's name?

A. At the time, the police officer gave me his name. He had a funny name, a strange name, but I didn't personally get it from him; no.

In addition to the testimony of club personnel, Sergeant Hullet with Metro Police testified that he was in the room at Vanderbilt Hospital when Wright was pronounced dead. Over Defendant's objection, Hullet further testified that, having learned there was a second victim being treated at Baptist Hospital, he left to find that victim. Hullet testified that he located this victim, that his name was Said Awad, and that he was a Somalian refugee. Hullet, a nearly ten-year veteran of law enforcement, testified that the wound he observed appeared to be a gunshot wound with a hole on both sides of the leg, just a couple of inches below the knee. It looked as if the bullet had passed completely through the leg.

A rational jury could reasonably infer from the evidence that an individual, Said Awad, who was found near the pool tables, sustained bodily injury as a result of being shot in the leg. A rational jury could also infer that the second victim, Awad, was the Somalian refugee who was interviewed by Sergeant Hullet at some time close to 1:59 a.m., on October 18, 1997, at Baptist Hospital. Hullett testified that he had been at Vanderbilt Hospital with Wright, but after Wright's death at approximatley 1:59 a.m., he went to track down the second victim, who was reportedly at Baptist Hospital. Hullet testified that, upon finding the Awad, he observed what he determined to be a through-and-through gunshot wound to Awad's leg. We conclude, therefore, that the evidence at trial was sufficient to show bodily injury by use of a deadly weapon to an individual, Said Awad, and thus support a conviction of reckless aggravated assault against Said Awad beyond a reasonable doubt.

### C. Reckless Aggravated Assault of Omari Neal

The Defendant also asserts that the evidence was insufficient to convict him of the reckless aggravated assault of Omari Neal, the victim in count three of the indictment. The Defendant fails

to support this assertion in his brief with any argument, citation to authorities, or appropriate references to the record. This issue is, therefore, waived. <u>See</u> Tenn. R. Crim. P. 10(b).

Despite waiver, we find that a rational trier fact could reasonably infer from the evidence that Omari Neal, sustained bodily injury from a gunshot wound to his leg. At trial, Neal testified that he was present at Club Yesterday on the night of the shooting. Neal stated that he was standing beside Wright and the two were having a conversation prior to the shooting. Neal further testified that he was struck in the left leg by a bullet, when the shooting first started. From this evidence, a rational trier of fact could have found Defendant guilty of using a deadly weapon to recklessly cause bodily injury to Neal.

## **CONCLUSION**

In conclusion, the statements made to Officer Peeples by Chaka Moore were properly admitted as excited utterances and therefore an exception to the hearsay rule. There was no variance between the allegations in count two of the indictment and the proof offered at trial. Finally, the evidence was sufficient to support convictions in count one for first degree murder of Demetrius Laquan Wright and in counts two and three for the reckless aggravated assaults of Said Awad and Omari Neal, respectively. The judgment of the trial court is, therefore, affirmed.

_____
THOMAS T. WOODALL, Judge